Filed 11/5/13  P. v. Hill CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CURTIS JAMES HILL,<br><br>    Defendant and Appellant. | G046249<br><br>(Super. Ct. No. 09CF1955)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed.

Marleigh A. Kopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Curtis James Hill stands convicted of special circumstances murder for causing the death of Cecil Warren in the course of a robbery. Although Warren did not die until nearly four years after the robbery, the jury determined he did so as a result of the injuries appellant inflicted on him during that crime. Appellant contends his trial was unfair because the prosecution introduced statements that were taken in violation of his *Miranda* rights,[1] his attorney negligently allowed the jury to hear about other crimes he may have committed, and the state's expert medical witnesses referenced the findings of a nontestifying physician in rendering their opinions as to the cause of Warren's death. Appellant also contends cumulative error compels reversal and California's special circumstances law is unconstitutional. Finding appellant's contentions unmeritorious, we affirm the judgment.

FACTS

On November 11, 2003, Henry Stoltenberg woke up at around 4:00 a.m. and went for his usual morning walk in Huntington Beach. On past walks at that time of day, he had seen Cecil Warren doing grounds work at the Union Bank on Beach Boulevard. However, when Stoltenberg reached the bank that morning, Warren was lying in the fetal position in the parking lot, a few feet from his van. Warren's face was bloody and swollen, and when Stoltenberg asked him what happened, he said, "I've been mugged." Warren seemed to be going in and out of consciousness, so Stoltenberg called 911.

Warren was still coherent when the police and paramedics arrived at the scene. He said he had been "jumped" and "beaten up" and also revealed he had a history of heart problems. Although he did not appear to be in cardiac arrest, the paramedics considered Warren's situation to be serious and transported him to the hospital. After arriving there, Warren took a turn for the worse; he was less coherent and appeared to be

---

[1]    See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

having difficulty staying focused and oriented.  Eventually, he slipped into a coma and had to be placed on life support.

In investigating the incident, Huntington Beach Police Officer Mark Wersching reviewed surveillance tape from businesses in the area and discovered appellant and John McKinney patronized a Mobile gas station near the bank at about 4:15 on the morning in question.  Wersching also learned appellant and McKinney lived in close proximity to the bank.

On November 21, 2003, 10 days after the incident occurred, Wersching and a team of officers executed a search warrant at appellant's apartment.  During the search, appellant agreed to speak with Wersching and was interviewed in a bedroom in the presence of a second police officer.  The officers did not read appellant his *Miranda* rights before commencing the interview, which was tape recorded.  But they did tell appellant he was not under arrest.

Explaining what he did the night before Warren was assaulted, appellant said he and McKinney went out drinking.  They were dropped off in the early morning hours by the Union Bank and spotted a van in the parking lot of the bank.  Because the van was open and they did not see anyone around the vehicle, they decided to go "fuck around" with it.  As they were poking around inside the van, an "old man," Warren, appeared and asked them what they were doing.  Appellant punched Warren in the face, and when he fell to the ground, he searched his pockets and took his wallet.  Then he kicked Warren in the head and fled the scene with McKinney.

As part of his investigation, Wersching also interviewed appellant's boss, Asaf Ahmad.  Ahmad said that when he picked up appellant for work on the morning Warren was assaulted, appellant talked about "jacking someone."

The investigation also revealed that appellant's DNA profile matched the DNA profile of a hair that was found on the right rear pocket of Warren's jeans.  The odds of such a match occurring randomly were estimated to be about one in a trillion.

3

Appellant and McKinney were originally charged with assault and robbery. Although appellant pled guilty to the charges and was sentenced to prison, that was not the end of his legal woes. On September 22, 2007, nearly four years after the original crimes, Warren passed away at the age of 81. Warren's death prompted the prosecution to file new charges against appellant and McKinney. The prosecution charged them with first degree felony murder for causing Warren's death in the course of a robbery and a burglary. (Pen. Code, §§ 187, subd. (a), 189.) The prosecution also alleged as special circumstances that they murdered Warren while they were engaged in the commission of a robbery and a burglary. (Pen. Code, § 190.2, subd. (a)(17)(A) & (G).)

Appellant and McKinney were tried separately.[2] At appellant's trial, the prosecution elected not to present any evidence regarding his prior guilty plea. Thus, it was required to prove appellant's guilt independent of earlier proceedings.

Before trial, appellant moved to suppress his confession on the grounds it was involuntarily rendered and not preceded by *Miranda* warnings. The trial court denied the motion, but at appellant's request, it did order the prosecution to redact his confession so as to eliminate any references to his prior criminal activity.

At trial, the state called two expert medical witnesses to testify about the cause of Warren's death. The first was Dr. Aruna Singhania, the forensic pathologist who conducted Warren's autopsy, and the second was Dr. Singhania's supervisor, Anthony Juguilon, M.D., who is the Chief Forensic Pathologist for Orange County. During their testimony, these experts explained that, in forming their opinions about the case, they relied on multiple sources of information, including a report prepared by neuropathologist John Andrews, M.D. Dr. Andrews did not testify at trial, nor was his report admitted into evidence.

---

[2]     McKinney has a separate appeal pending in this court that raises issues that are unrelated to those put forth by appellant.

4

Based on all the information they acquired, Dr. Singhania and Dr. Juguilon determined Warren died of bronchopneumonia. They surmised Warren's feeding tube, which was part of his life support system, caused an infection which led to pneumonia in his lungs, and eventually that caused his major organs to shut down. As for why Warren had to be placed on life support in the first place, Drs. Singhania and Juguilon believed he suffered blunt force trauma to the head. Due to that trauma, Warren could not breathe on his own and required a feeding tube and ventilator to stay alive, which led to him contracting the fatal bronchopneumonia.

Trial was by jury. Defense counsel did not call any witnesses on appellant's behalf, but in closing argument, he argued appellant was not guilty of special circumstances murder because in attacking Warren, he did not commit the underlying crimes of robbery or burglary. Defense counsel also argued the prosecution failed to prove appellant's actions were the cause of Warren's death.

The jury disagreed. Although it found the burglary-murder special circumstance allegation not true, it convicted appellant of first degree murder and found the robbery-murder special circumstance allegation true. Thereupon, the trial court sentenced appellant to life in prison without parole.

I

As he did at trial, appellant contends the court should have suppressed his confession because it was involuntarily rendered and obtained in violation of *Miranda*. We disagree.

The admissibility of appellant's confession was litigated both at the preliminary hearing and at an Evidence Code section 402 hearing before trial. The central issue was whether appellant was in custody at the time he was interviewed, thereby requiring the detectives to read him his *Miranda* rights. (See *Oregon v. Mathiason* (1977) 429 U.S. 492, 495 ["*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'"].)

5

At the preliminary hearing, Wersching testified regarding the circumstances under which the interview took place.  He said that a week and half after Warren was assaulted, he and about 10 other police officers went to appellant's apartment to serve a search warrant and look for evidence of the crime.  The officers were in uniform and wearing "raid vests" when they arrived at the apartment.

Wersching knocked and gave notice at the door, and when the officers gained entrance, they had their guns drawn.  Inside, they discovered appellant and his wife and their baby, along with two other adults and two children.  Appellant was contacted in an upstairs bedroom.  At gunpoint, he was ordered to walk downstairs into the living room.  He was then searched and ordered to sit on the couch with the other occupants of the apartment, who had been rounded up in a similar fashion.  Asked at the preliminary hearing if appellant was handcuffed during that time, Wersching testified, "I don't believe any of the occupants were handcuffed at that point."

Wersching explained that once all of the occupants were searched and seated, the officers put away their weapons because the apartment had been secured.  This was about five minutes post-entry, according to Wersching.  After that, some of the officers remained in the living room along with the occupants and some of the officers began searching the apartment.  Wersching and his partner Mike Nakama turned their attention to appellant.

Wersching asked appellant if he would speak with him upstairs, and appellant agreed to do so.  Wersching and Nakama then escorted appellant upstairs into one of the bedrooms.  The officers did not have their weapons drawn, nor did they make any threats or promises to appellant.  Appellant sat on the bed, next to Wersching, and Nakama sat in front of appellant on a chair.  The door to the bedroom remained open at all times.  Asked if Nakama was "stationed in a way that he was between [appellant] and the door," Wersching said Nakama was "closer to the closet."

6

Still, Wersching was not worried about appellant going anywhere, as made clear by the following exchange:

"Q. [Defense counsel]: Was there concern [appellant] might get up and walk out?

A. [Wersching]: No, I wasn't concerned [about] that.

Q. Well, this was – the search was ongoing, [appellant] was detained at this point, was he not?

A. He was.

Q. Did you tell him that?

A. Yes.

Q. Okay. What did you tell him about that?

A. I told him that he was not under arrest and that we were not going to be taking him to jail tonight.

Q. But you also said he wasn't free to leave; is that correct?

A. No, I didn't tell him that.

Q. In your mind he [wasn't] but you didn't tell him that, you're saying?

A. Yes."

Testifying further, Wersching said appellant was not advised of his *Miranda* rights before the interview began. He estimated the search of appellant's apartment lasted about an hour and a half, and appellant's interview lasted "approximately an hour, maybe a little longer." Wersching also said the entire interview was tape recorded, and at no time was appellant ever questioned off the record.

The contents of the tape were transcribed and made available to the court. The transcript shows the officers started out the interview by obtaining general background information from appellant. Wersching then told appellant he and Nakama wanted to ask him some questions about a robbery and assault that had occurred in the area. He also told appellant a judge had determined there was probable cause to search his

7

apartment. However, Wersching assured appellant "you're not under arrest" and "I'm not arresting you tonight. You're gonna sleep here with your wife and baby tonight." After appellant made a reference to one of his roommates, Wersching reiterated to him, "I'm not taking you to jail. You're not under arrest, okay? Do you understand that?" Appellant replied, "Yes."

At that point, the officers questioned appellant about where he was and who he was with on the night before Warren was assaulted. The nature of the questioning was conversational, and appellant answered most of the questions with little prodding. He was unable to provide some details, which he attributed to the fact he had been drinking that night, but he was able to provide a fairly detailed account as to how he, McKinney and his friend Anna spent the night gallivanting about. In fact, a considerable amount of the interview is devoted to this subject.

In describing events, appellant initially claimed Anna dropped him off along with McKinney around 6:00 a.m. Then they "kicked it" in McKinney's garage for a while before appellant eventually went home. Appellant did not say anything about Warren or incriminate himself in any fashion up to that point in the interview.

Skeptical of appellant's story, Wersching asked him if he was sure about the time he and McKinney got dropped off, and appellant said he really couldn't remember. Then Wersching informed appellant that surveillance camera footage showed him and McKinney entering the Mobile station around 4:00 a.m. on the morning in question. Appellant told Wersching he couldn't remember going to the Mobile station, "But now that you said you seen me on [the surveillance tape], then I guess I did." Appellant added, "[M]y mind was gone" from the drinking. "I'm not sure what exact time[] it was."

At that point, Nakama turned up the heat on appellant, and the following exchange took place:

"Q. [Nakama]: We've talked to a lot of people, we have a lot of facts, okay? We know that you were in the gas station, the Mobile gas station . . .

8

A. [Appellant]: Mm hm.

Q. . . . with [McKinney], okay? You know that we've talked to a lot of people. You know that we hit [McKinney's] pad with a search warrant.

A. Mm hm.

Q. We talked to his whole family, okay. We know that you guys left the Mobile gas station around 4:20.

A. Mm hm.

Q. Okay. The clerk up there saw you guys walking outside. You were walking southbound on Beach Boulevard.

A. Mm hm.

Q. Okay? All we're trying to find out is what happened when you guys walked down that way, okay?

A. Mm hm.

Q. We have an idea what happened but you and [McKinney] were walking that way in that area.

A. Mm hm.

Q. You're not responsible for everything that every one does. You're responsible for yourself.

A. Mm.

Q. Okay? But you need to tell us about what you saw that night because it's very important. Do you understand what I'm saying?

A. Mm hm.

Q. We've been doing this a long time. We know what's going on. You know what's going on. We don't need to play any cat and mouse games here.

A. Mm hm.

Q. We want the truth. That's all. Okay. We haven't been unreasonable with you.

A. Mm hm.

Q. We told you you're not under arrest, okay. But we need to have the truth because here's the problem we have. You know Detective Wersching here, he's trying to get facts, he's trying to get statements from you, okay.

A. Mm hm.

Q. If, if you start telling us things that we know are lies, it bothers us.

A. Mm hm.

Q. Okay? We feel like you're trying to hide something. But you may be scared only because you don't want to say what you seen happen. Okay? I'm not trying to put the blame on you[] or anything.

A. Mm hm.

Q. You're not responsible for what every one does, right?

A. Right.

Q. Maybe someone did something you didn't like. I wouldn't like that if somebody did something. Okay? But if you lie about it and you don't tell us about it, what are we supposed to think? You know what I mean?

A. Mm hm.

Q. It's obvious everyone around this whole neighborhood knows what's going on. . . . Just tell us what happened when you guys were walking away from the Mobile station. Did somebody act like a fool and do something?

A. Yeah.

Q. They sure did, right?

A. Yeah.

Q. You know that. Just tell us about it. That's all. You're memory's real good. I commend you for your memory. You gave us a lot of details . . . about what happened. You can remember blow by blow where you were, where you drove, who you

10

were with. You told us all that. But when we talk about the critical time, its gets fuzzy. That's pretty obvious, right?

A. Yeah.

Q. We're not stupid.

A. I'll tell it straight up right now."

Appellant proceeded to explain how the confrontation with Warren transpired. He said that when he first entered Warren's van, he grabbed hold of an edging tool. Asked by Wersching what he intended to do with the tool, appellant said, "Nothing, I was just being stupid." He also said McKinney was looking around inside the van. When Warren appeared and asked them what they were doing, he got nervous and slugged him in the face, causing him to fall. As to why he hit Warren, appellant explained, "I got like nervous. And when I get nervous and I'm drunk, I start getting like paranoid" to the point "where I don't think about shit, I just do it." "And that's the only thing that came to my mind was hitting him."

Continuing his story, appellant said that after he hit Warren, he reached down and took his wallet. Then he kicked Warren in the head and he and McKinney took off running. They went to McKinney's place, divvied up the money and burned the wallet. Then appellant went home and slept for a couple of hours. He said that when he went in to work later that morning, he told a couple of people he had "robbed somebody last night."

As the interview was winding down, the officers obtained a DNA sample from appellant and engaged him in small talk about his work and family. At appellant's request, they also allowed his wife to come upstairs so he could talk to her about the situation. Appellant was concerned that one his roommates was going to "beat him up" after the police left, so the officers allowed him to leave the apartment with his wife and baby. However, once they were outside, they arrested appellant on a misdemeanor warrant.

11

During the preliminary hearing, defense counsel objected to the admission of appellant's statements on the grounds the detectives did not read him his *Miranda* rights prior to questioning. The magistrate said it was a "close call" but ultimately determined appellant's statements were admissible because he was not in custody at the time he was interviewed.

Before trial, appellant renewed his *Miranda* objection. He also argued his interview statements should be suppressed because they were involuntarily rendered in violation of his due process rights. At a hearing on the issue, the parties agreed to let the trial court consider the preliminary hearing transcript as part of the factual basis for the motion. They also submitted appellant's interview for the court's consideration.

Regarding the preliminary hearing transcript, the court was troubled by what it described as an "ambiguity in the record." Particularly, the court was having difficulty figuring out what it considered to be a key factor in the case, i.e., whether Wersching ever told appellant he was detained. At the court's invitation, the prosecution called Wersching to the stand in the hopes of clarifying that issue.

Wersching testified that upon entering appellant's apartment, he first made contact with appellant as he was being escorted down the stairs by other officers. Wersching testified he could not remember if appellant was handcuffed when he was taken into the living room, searched and told to sit down with the others. After appellant agreed to speak with him, they walked upstairs and entered one of the bedrooms, along with Officer Nakama. Wersching testified appellant walked back up the stairs and entered the bedroom on his own free will. Describing appellant's demeanor as cooperative, Wersching said he was not handcuffed or restrained in any fashion at that time.

Turning to the detention issue, Wersching testified he had reviewed the portion of his preliminary hearing testimony where he said he had told appellant he was detained. Asked if he presently had any independent recollection of telling that to appellant or saying anything to him about whether he was free to leave, Wersching

testified "no." He said the only thing he could recall telling appellant in that regard is what is on the tape recording. That is, telling appellant that he was not under arrest and that he would be able to sleep in his own bed that night. Wersching said there was no other conversation about appellant's freedom of movement other than what's on the tape, and he never told appellant he could not leave. Wersching said the only time appellant's movement was restricted and he was told what to do was when the officers initially entered the apartment and secured the premises.

On cross-examination, defense counsel came back to Wersching's preliminary hearing testimony. He asked Wersching if he was being truthful when he previously testified he had told appellant he was detained. Wersching said he was being truthful at that time, but he could not presently remember telling that to appellant.

In argument to the court, defense counsel argued the circumstances surrounding appellant's interrogation could not have been "more overbearing" and clearly supported the conclusion appellant was in custody at the time he was interviewed. He said that, based on Wersching's preliminary hearing testimony, Wersching must have told appellant he was detained before he turned on the tape recorder because "it's not on the transcript." He argued that, all things considered, there was a "de facto arrest" or the "functional equivalent of an arrest for *Miranda* purposes."

The trial court disagreed. With respect to Wersching's preliminary hearing testimony about telling appellant he was detained, the judge stated, "The way I interpret that . . . in the context of what I've now read and heard is that when the officers came in initially before the [apartment] had been secured and before [appellant] was taken upstairs for a conversation, . . . before the tape [recorder] was on, everyone inside the [apartment] was told that they were being detained."

The trial court presumed this created an intrusive and intimidating situation for the occupants. But, even assuming the police handcuffed appellant when they initially contacted him and ordered him to come downstairs, the court found appellant

13

was no longer in handcuffs when Wersching asked him if he would be willing to talk. And since the request was posed as a question, as opposed to a command, appellant would have reasonably understood that he had an option in terms of speaking with Wersching.

Continuing its analysis, the judge stated, "Walking up those stairs, it is still an intrusive situation. I don't want to say coercive; I'm not going to go that far. But it's an intrusive, intimidating situation. Had [Wersching] not continued to defuse the situation by specifically telling [appellant] . . . he was not under arrest and he would not be arrested no matter what he said during that conversation, my ruling might be otherwise. [¶] But considering all of the [circumstances] . . . I find that this was a non-custodial interview. Therefore, *Miranda* warnings were not required[.]"

The trial judge also rejected appellant's claim his statements were involuntarily rendered. In so doing, the judge said he was "struck by the noncoervice [and] non-intimidating nature of the conversation." "The officers [gave appellant] plenty of opportunity to say whatever he want[ed] to say. It [was] not intimidating. I don't find it coercive. I don't find any evidence that the officers in some way over[bore] [appellant's] free will and created an involuntary situation." The judge therefore denied appellant's motion to suppress the statements he made during the interview.

Our analysis begins with United States Supreme Court's landmark ruling in *Miranda, supra,* 384 U.S. 436. In that case, the United States Supreme Court established "concrete constitutional guidelines" for police officers to follow when they are questioning a suspect who "has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Id.* at pp. 442, 444, fn. omitted.) The court ruled that, under those circumstances, the suspect must be advised he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Id.* at p. 479.)

14

These so-called "*Miranda* warnings" have "become embedded in routine police practice to the point where [they] have become part of our national culture. [Citation.]" (*Dickerson v. United States* (2000) 530 U.S. 428, 435, 443, italics omitted.) Although sometimes described as "'prophylactic'" in nature (*id.* at pp. 437-438, quoting *New York v. Quarles* (1984) 467 U.S. 649, 653), they are constitutionally required to safeguard a suspect's Fifth Amendment right against self-incrimination. (*Id.*, at p. 444 [the *Miranda* decision created a federal "constitutional rule" that may not be superseded by Congress].)

Still, the police are not required to administer *Miranda* warnings to every person they interview. Indeed, the United States Supreme Court has repeatedly held that, unless a suspect is "in custody" at the time he is questioned, the *Miranda* ruling does not come into play. (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 660-663 [reviewing the "clearly established law" in this area].) So, what are the key elements that courts look to in determining whether a suspect has been placed in "custody" for *Miranda* purposes?

"'Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' [Citation.]" (*Yarborough v. Alvarado, supra,* 541 U.S. at p. 663.) In examining these issues, we must defer to the trial court's factual findings that are supported by substantial evidence, but we independently examine the legal question of whether the defendant was in custody when he was questioned by the police. (*Thompson v. Keohane* (1995) 516 U.S. 99, 112-113; *People v. Cunningham* (2001) 25 Cal.4th 926, 992.)

It is undisputed that when the police entered appellant's apartment to execute the search warrant, they did so with a considerable amount of force and authority. At least 10 uniformed officers wearing raid vests were involved in the search, and when they went inside, they had their weapons drawn and ordered the occupants into the living room area, where they were searched and seated. It also appears the occupants, including appellant, may have been handcuffed momentarily during this initial phase of the search, which according to Wersching, lasted about five minutes.

However, "[h]andcuffing a suspect does not necessarily dictate a finding of custody. [Citation.]" (*United States v. Booth* (1981) 669 F.2d 1231, 1236; accord *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1404-1405 [recognizing this principle but finding the defendant in that case was in custody since he "remained in handcuffs when the investigating officer interrogated him."].) In executing a search warrant, "[s]trong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody. [Citation.] The officers may take reasonable steps to maintain the status quo. [Citation.]" (*Ibid*.)

The situation during the officers' initial entry into appellant's apartment was no doubt forceful and intimidating, and no reasonable person would have felt free to leave during this phase of the search. But the measures utilized by the officers were reasonable considering the fact they were investigating a violent crime and there were a large number of people inside the apartment.

After the premises were secured, the officers put away their weapons and the next phase of the search took place. While some of the officers stayed in the living room to keep an eye on the seated occupants, other officers began searching the apartment for evidence. That's when Wersching asked appellant if he would be willing to speak with him. When appellant said yes, Wersching and Nakama walked with him upstairs into one of the bedrooms. According to Wersching, he and Nakama "escorted" appellant up the stairs, but they did not force or restrain him in any fashion; rather,

16

appellant made his way into the bedroom of his own free will. The fact Wersching *asked*, as opposed to *commanded*, appellant to speak with him, and appellant *voluntarily* acquiesced to this request, supports the conclusion he was not in custody at this time. (*Oregon v. Mathiason, supra,* 429 U.S. 492; *People v. Linton* (2013) 56 Cal.4th 1146, 1167.)

It is also significant that Wersching repeatedly told appellant he was not under arrest and he would be spending the night at home with his family. This signaled to appellant he was not under compulsion to speak with the officers. (*United States v. Salvo* (6th Cir. 1998) 133 F.3d 943, 951; *People v. Linton, supra*, 56 Cal.4th at p. 1167.) The officers did not go the additional step of telling appellant he was free not to speak with them, but they did not tell appellant he could not leave either. And the fact they had *asked* him if he would talk to them implied his freedom to refuse. Assuming Wersching did tell appellant he was "detained," as he testified at the preliminary hearing, the record supports the trial court's finding this statement was made during the initial security sweep of the apartment, when the officers gathered up all of the occupants and took them into the living room area to be searched and seated. Had appellant been interrogated then and there, there would be little question that *Miranda*'s custody requirement would have been met.

But he wasn't. Instead, the officers obtained his permission to speak with him and then escorted him to a room in a separate part of the house. As appellant points out, this had the effect of isolating him from his family. However, it also distanced him from his angry roommate, which likely eased appellant's mind to some extent. Before interrogating appellant, the officers also repeatedly told appellant he was not under arrest, which appellant expressly acknowledged, and explained why they wanted to talk to him. They were in close proximity to appellant, and the interview itself turned out to be rather lengthy, yet the door remained open and it appears appellant's path to it remained largely unobstructed.

17

These circumstances support the conclusion appellant was not in custody at the time he was interviewed. Indeed, California decisional law is clear that *Miranda* warnings are not required every time the police initially use weapons or other force to detain a suspect: "'For *Miranda* purposes, . . . the crucial consideration is the degree of coercive restraint to which a reasonable citizen believes he is subject *at the time of questioning*. Police officers may sufficiently attenuate an initial display of force, used to effect [a detention], so that no *Miranda* warnings are required when questions are asked.'" (*People v. Thomas* (2011) 51 Cal.4th 449, 478, quoting *People v. Taylor* (1986) 178 Cal.App.3d 217, 230.)

As to the attenuation issue, it is noteworthy that appellant was only detained for a brief period of time at the outset of the search. Wersching estimated it only took about five minutes for the officers to obtain control over the premises, at which time they freed appellant of any physical restraint and asked him if he would be willing to speak with them. The officers' initial show of force was forceful and direct, to be sure, but the tenor of the encounter changed significantly after they secured the apartment. And by the time the officers actually got around to questioning appellant, he was neither formally arrested nor restrained to a degree associated with a formal arrest. (See *In re Joseph R.* (1998) 65 Cal.App.4th 954, 958 [although the defendant was initially handcuffed in the back of a police car, he was not in custody for *Miranda* purposes when he was later questioned because his initial detention lasted only about five minutes, which the court characterized as being "extremely short"].)

In arguing otherwise, appellant relies on two cases from the Ninth Circuit Court of Appeals, *United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073 (*Craighead*) and *United States v. Kim* (9th Cir. 2002) 292 F.3d 969 (*Kim*). But these decisions are factually distinguishable from the present case.

In *Craighead*, the defendant was directed into and questioned inside a storage room in the back of his house while officers from three different law enforcement

18

agencies searched his residence for evidence of child pornography. (*Craighead, supra*, 539 F.3d at pp. 1077-1079.) Although the defendant was informed by an FBI agent that he was free to leave, any statements he made would be voluntary, and he would not be arrested at the conclusion of the interview, the Ninth Circuit found this meant very little in terms of the custody issue because the circumstances were unclear as to whether the FBI agent was speaking for all of the agencies that were present during the search. (*Id*. at p. 1085.) Moreover, there was evidence that when the defendant was interviewed, "the door was closed behind him" and a detective was "leaning with his back to the door in such a way as to block [defendant's] exit from the room." (*Id*. at p. 1086.) These factors were pivotal to the Ninth Circuit's determination the defendant was in custody for *Miranda* purposes during the interview. (*Id*. at p. 1088.)

Here, in contrast, only one law enforcement agency was involved in the search. At the outset of the interview, Wersching and Nakama made it clear they were both from the Huntington Beach Police Department, and appellant never expressed any confusion as to who was in charge or what was going on. In addition, after appellant agreed to be interviewed, the officers left the bedroom door open while they questioned him. These circumstances, which were absent in *Craighead*, militate against a finding of custody.

The fact the officers asked appellant if he would be willing to speak with them and were respectful to him during the interview also sets this case apart from *Kim*. In that case, the officers told the defendant to "shut up" and ordered her to speak English, even though her native language was Korean and they knew she did not speak English very well. (*Kim, supra*, 292 F.3d at pp. 971-975.) And, unlike the situation here, they did not tell the defendant she was not under arrest before they questioned here. In fact, there was no evidence that the defendant in *Kim* ever acquiesced to being interviewed. (*Ibid*.)

19

In our case, there was no language issue, appellant was asked and agreed to be interviewed, and he was informed and acknowledged he was not under arrest. He was also told that no matter what he said, he would be spending the night with his family at the apartment. Although not dispositive, it appears appellant actually believed this because at the end of the interview he expressed concern about what his roommate was going to do to him after the police left the apartment. Appellant apparently did not think he was going to be arrested, even *after* he confessed to assaulting Warren.

Regardless of appellant's subjective beliefs, the objective circumstances surrounding the interview were not so coercive as to lead a reasonable person to believe appellant was restrained to a degree associated with a formal arrest. Therefore, he was not in custody during the interview, and the police were not required to read him his *Miranda* rights.

Appellant also contends his confession should have been excluded because it was obtained in violation of his right to due process. "The due process test takes into consideration 'the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation.' [Citations.]" (*Dickerson v. United States, supra*, 530 U.S. at p. 434.) If the record shows the defendant's will was overborne by the circumstances surrounding the interrogation such that his confession was coerced or compelled, it cannot be used against him. (*Ibid*.)

Like the trial court, in reading the transcript of appellant's interview we are struck by the fact that in interrogating appellant, Wersching and Nakama took a polite and professional tone from the very beginning. They allowed appellant to tell his story in his own words and permitted the interview to unfold in a slow-paced, conversational manner. Although appellant had difficulty remembering everything that happened on the night in question, he did not show hesitancy in answering the officers' questions. Thus, there was no need for the officers to exert pressure on him. It wasn't until after the midpoint of the interview that they confronted appellant with the surveillance tape and

20

urged him to come clean. They strongly implored appellant to tell the truth and claimed they already had a pretty good idea what happened, but they did not induce his confession by threat or promise, nor did they accuse him of anything. In fact, when appellant asked what was going to happen to him in terms of his case, they said they didn't know because it was out of their hands.

The totality of the circumstances convince us appellant was not speaking against his will but rather voluntarily confessed to his involvement in the crimes with which he was charged. Accordingly, the trial court properly allowed his confession to be introduced into evidence at his trial.

II

Appellant also contends his attorney was ineffective for failing to ensure the jury did not hear anything about other crimes he may have committed. We do not believe appellant's attorney was ineffective in this regard.

In order to succeed on a claim of ineffective assistance of counsel, a defendant must show counsel's performance was objectively unreasonable under prevailing professional norms. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) The defendant must also affirmatively establish prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) To do this, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.) Under this standard, the defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

Appellant claims his attorney was remiss for failing to prevent the jury from hearing about other crimes he may have committed. The issue about other crimes surfaced in light of the fact that, during his interview with Wersching and Nakama,

21

appellant admitted he had previously been involved in gang activity and committed other robberies. However, at defense counsel's request, the trial court ordered the prosecutor to redact this information from the tape and the transcript of the interview. Specifically, the court told the prosecutor, "I don't want to hear anything about the prior alleged robberies or any gang activity in the People's case-in-chief." The court also ordered the prosecutor to meet and confer with defense counsel to ensure he was content with the redactions.

After the redactions were made, defense counsel agreed they were satisfactory. However, toward the end of the trial, after the interview tape had already been played for the jury, defense counsel told the court there was a reference to appellant's prior criminal activity that should have been redacted from the tape. That reference also appeared in the transcript of the interview, which the jurors were given when the tape was played for them.

The reference came up toward the end of the interview, after appellant had already confessed to assaulting Warren. Nakama asked appellant, "And have you, have you . . . It sounds like you . . . mainly jack people on the street. Is that correct?" Appellant answered, "Yeah."

In bringing this issue to the court's attention, defense counsel stated, "I missed [the reference] in my review, just to concede that. I don't think it was done maliciously but it was in there[.]" The court said it was a "close call" as to whether the reference violated its pretrial ruling to omit reference to appellant's prior criminal activity. However, "in abundance of caution" the court ordered the prosecutor to redact the reference on the tape and the transcript. The newly-redacted versions of the tape and transcripts were made available to the jury during its deliberations, but there is nothing in the record to suggest the jury actually asked to review them in deciding the case.

Appellant argues his attorney should have pressed the issue further and moved for a mistrial because the reference rendered his trial unfair. Characterizing the reference as "improper propensity evidence," he asserts the "jury more than likely was

22

biased against him upon learning that he engaged in other robberies . . . ." However, the jury didn't hear any evidence about any other robberies. In fact, the wording of the challenged statement makes it hard to figure out exactly what appellant admitted to.

In assessing prejudice, it is also significant that the single, fleeting reference to "jack[ing]" was made during the course of a lengthy taped interview that focused not on appellant's *past* behavior, but his actions in the *present* case. At no point did the prosecution ever attempt to use the reference to denigrate appellant's character or prove he was prone to criminal behavior. As a matter of fact, after the tape was played, the reference was never alluded to by either party while the jury was present. Under these circumstances, it is not reasonably likely the reference affected the verdict. Because the reference does not undermine our confidence in the verdict, reversal is not required.

### III

Next, appellant asserts the trial court erred in allowing expert medical witnesses Singhania and Juguilon to rely on Dr. Andrew's pathology report in forming their opinions about the cause of Warren's death. Given that Dr. Andrews did not testify at trial, appellant contends the experts' reliance on his report allowed the jury to hear prejudicial hearsay evidence and violated his right to confront witnesses. We do not believe that was the case.

As we stated in the facts above, Dr. Singhania and Dr. Juguilon relied on several sources of information in forming their opinions in this case. In order to properly analyze appellant's claims, we must thoroughly examine not only what they relied on, but how they conveyed their opinions and how the jury was told to assess their testimony.

As the physician who conducted Warren's autopsy, Dr. Singhania testified to the physical condition of Warren's body. She stated Warren had signs of heart disease, diabetes and chronic obstructive pulmonary diseases (COPD). In addition, he had a scab on the right side of his forehead and a scar on his left cheek below his eye. The scar was

consistent with craniofacial injury or trauma of some sort. However, Dr. Singhania did not detect any signs of injury to Warren's skull.

With respect to Warren's brain, Dr. Singhania said she removed the organ from his skull and examined it externally only. Not seeing any abnormalities, she sent Warren's brain to Dr. Andrews, who, as a neuropathologist, specializes in the central nervous system. Whereas Dr. Singhania only conducted a gross external examination of Warren's brain, Dr. Andrew's examination involved both an exterior and microscopic examination of that organ.

Dr. Singhania testified it is customary for her to rely on information from other people in forming her opinions about forensic matters. She said that in this case, she reviewed a "brief investigation report" as well as some of Warren's medical records prior to conducting his autopsy. She also testified she had "been briefed" about the circumstances of Warren's death, including the fact he had suffered blunt force trauma to the head. Dr. Singhania opined that trauma is what landed Warren on life support and led to his eventual death.

Dr. Singhania stated that in addition to the investigation report and medical records she received, she also relied on Dr. Andrew's report in determining the cause of Warren's death. Particularly, she relied on Dr. Andrew's finding that Warren had "chronic sequelae," i.e., scarring, on his brain, which is indicative of blunt force trauma to the head. Speaking to the effect of that trauma, Dr. Singhania testified "that's why [Warren was] not able to breathe by himself [and] . . . was on a life support. And that's how I put the cause of death."

During her testimony, Dr. Singhania admitted that when she receives information from other sources during the autopsy process, her lack of first-hand knowledge about the information precludes her from knowing if it is actually accurate and correct. However, she can effectively verify the information she receives by comparing it to her own observations and findings. When asked if her findings were

24

consistent with the finding that Warren had "post chronic sequelae of blunt force trauma to the brain," Dr. Singhania answered, "That's correct."

Like Dr. Singhania, Dr. Juguilon testified he relied on a variety of information in forming his opinions about the cause of Warren's death. While he did not receive any information from the police, he did review Warren's medical records, Dr. Singhania's autopsy report and the autopsy photos. He also considered Dr. Andrew's pathology report.

Dr. Juguilon testified that, as a neuropathologist, Dr. Andrews would have training "above and beyond" the typical forensic pathologist. He also said it was common to "send out certain items such as the brain to a neuropathologist for a consult and report on that particular organ." Dr. Andrews' report indicated Warren suffered from DAI, diffuse axonal injury. Dr. Juguilon explained DAI is a widespread brain injury that often follows severe head injuries. In diagramming what the injury looks like for the jury, he said it occurs when axons separate from the body of a nerve cell. When there is evidence of this separation over a large portion of the brain, it signifies diffuse axonal damage or DAI. The injury causes irreversible damage to the nerve cells and cessation of normal nervous system function, often resulting in unconsciousness or lengthy coma. It also necessitates the need for life support in many cases.

Dr. Juguilon testified DAI can only be caused by "severe blunt head trauma," such as a hit or kick to the head. In his opinion, Warren suffered blunt force trauma to the head, which triggered a coma and the need for life support. Warren's feeding tube then caused an infection, which led to the pneumonia, which was the ultimate cause of his death. However, Dr. Juguilon believed blunt head trauma was the direct cause of Warren's death because it set in motion the chain of events that led to his demise. While Dr. Juguilon acknowledged Warren's other ailments, such as heart disease and diabetes, may have been contributing factors to his death, he did not believe they were an intervening or independent cause of death.

On cross-examination, Dr. Juguilon admitted he was not present when Dr. Singhania performed Warren's autopsy or when Dr. Andrews examined Warren's brain. Nor did he speak with them about their findings. He said he arrived at his opinions about the case independently after examining all the information that was provided to him.

During the course of Dr. Singhania and Dr. Juguilon's testimony, defense counsel repeatedly objected to the fact they relied on hearsay evidence in forming their opinions about the case. Although the trial court overruled defense counsel's objections, it told the jurors, during both Dr. Singhania's and Dr. Juguilon's testimony, that they could not consider this hearsay evidence for its substantive truth. Rather, they could only consider it for the limited purpose of evaluating the basis of the experts' opinions. The court also told the jurors they were free to disregard the opinion of an expert, and if they did not believe the basis for the expert's opinion was reliable, they could consider that in evaluating the expert's testimony.

In this regard, the court told the jury, "[I]f an expert witness gives opinions and to some degree they are based on hearsay information . . ., you can look behind the opinion to see whether or not you think the hearsay upon which [the expert] relied was based on fact. And if you find that the hearsay was not based on fact, then you may find that affects the weight to which you give the opinion[.]" At another point, the court told the jurors that, in evaluating the believability of an expert opinion, they should consider "the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate."

Appellant contends that, by allowing Drs. Singhania and Juguilon to testify about the contents of Dr. Andrew's report, the trial court violated both state and federal law. Under the state rules of evidence, "[a]n expert may generally base his opinion on any 'matter' known to him, including hearsay not otherwise admissible which may 'reasonably . . . be relied upon' for that purpose. (Evid. Code, § 801, subd. (b); *In re Fields* (1990) 51 Cal.3d 1063, 1070 [].) On direct examination, the expert may explain

26

the reasons for his opinions, including the matters he considered in forming them. However, prejudice may arise if, '"under the guise of reasons,"' the expert's detailed explanation '"[brings] before the jury incompetent hearsay evidence."' [Citation.]" (*People v. Montiel* (1993) 5 Cal.4th 877, 918.)

To guard against this eventuality, the trial court '"has considerable discretion to control the form in which the expert is questioned . . . .' [Citation] A trial court also has discretion 'to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein.' [Citation.] This is because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact. [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.)

In this case, it is clear the trial court was aware of its responsibility to balance the "jury's need for information sufficient to evaluate an expert opinion" against appellant's "interest in avoiding substantive use of unreliable hearsay[.]" (*People v. Montiel, supra,* 5 Cal.4th at p. 919.) It repeatedly admonished the jury that, while experts may rely on hearsay in forming their opinions, and while the jury could consider the reliability of that hearsay in evaluating the experts' opinions, the jury could not consider the hearsay for the truth of the matter asserted therein.

At one point, the court did tell the jurors to consider whether the information on which the experts relied was "true and accurate." But that was in the context of explaining to the jury how they should go about evaluating the experts' opinions, so it is unlikely the jurors considered that information as substantive evidence, especially when they were repeatedly instructed *not to do so*. Viewing the instructions as a whole, we are convinced they adequately informed the jury of the limited purpose for which the information in Dr. Andrew's report was offered. We believe the court exercised its discretion admirably in handling this delicate issue.

27

Given that Dr. Andrews did not testify at trial, appellant argues the experts' reference to his findings also violated his federal constitutional right to confront witnesses. (U.S. Const., 6th Amend.) In so arguing, appellant relies on *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and its progeny, which have established the Sixth Amendment's Confrontation Clause prohibits testimonial hearsay unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. (*Id.* at pp. 53-54; see also *Davis v. Washington* (2006) 547 U.S. 813; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305; *Michigan v. Bryant* (2011) 562 U.S. __ [131 S.Ct. 1143]; *Bullcoming v. New Mexico* (2011) 564 U.S. __ [131 S.Ct. 2705]; *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221].)

Dr. Andrews was not shown to be unavailable, nor did appellant have an opportunity to cross-examine him before trial. However, in *Crawford*, the high court stated the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. [Citation.]" (*Crawford, supra*, 541 U.S. at p. 59, fn. 9; see also *Williams v. Illinois, supra,* 567 U.S. at p. __ [132 S.Ct. at p. ____] (plur.opn.) [admission of out-of-court statements contained in lab report did not violate the Confrontation Clause because they were not offered for their truth]; compare *People v. Lopez* (2012) 55 Cal.4th 569 [Confrontation Clause potentially implicated where prosecution relied on nontestifying declarant's lab report to prove the truth of its contents].) Because the information contained in Dr. Andrew's report was not offered for its truth, but simply to establish the basis for Dr. Singhania's and Dr. Juguilon's expert opinions, its admission did not violate appellant's confrontation rights.

Even if the information in Dr. Andrew's report had been admitted for its truth, the result would be the same. That's because the information that Drs. Singhania and Juguilon relied on and revealed to the jury was limited to Dr. Andrew's objective findings regarding the condition of Warren's brain. To wit, they relied on Dr. Andrew's personal observations that Warren's brain had signs of chronic sequelae and DAI. As

28

defense counsel emphasized in closing argument, at no point did they ever mention Dr. Andrew's opinion regarding the cause of Warren's death, or even whether or not Dr. Andrews had actually reached on opinion on that issue.

In *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), the California Supreme Court addressed a very similar situation. As in our case, a forensic pathologist was allowed to give his expert opinion on the cause of the victim's death based on "objective facts about the condition of the victim's body as recorded in the autopsy report" of a nontestifying pathologist. (*Id*. at p. 612.) Also like our case, the expert was allowed to refer to those objective facts in explaining the basis for his opinion, but the autopsy report itself was not admitted into evidence. (*Ibid*.) In determining whether the jury's exposure to the information in the autopsy report violated the defendant's Sixth Amendment rights, the *Dungo* court explained that an out-of-court statement must possess "two critical components" to be testimonial: "First, . . . the statement must be made with some degree of formality or solemnity. Second, . . . its primary purpose [must] pertain[] in some fashion to a criminal prosecution." (*Id*. at p. 619.)

The hearsay information at issue in *Dungo* possessed neither of those qualities. Contrasting objective *observations* about the condition of the victim's body with subjective *conclusions* about the cause of death, the Supreme Court ruled statements in the former category lack the requisite formality or solemnity to be testimonial. (*Dungo, supra*, 55 Cal.4th at pp. 619-620.) Moreover, because autopsies are conducted not only to facilitate criminal investigations, but also to provide information relevant to civil proceedings, insurance claims and other issues, it cannot be said that their *primary purpose* pertains to criminal prosecution. (*Id*. at pp. 620-621.) Therefore, *Dungo* concluded the expert's reliance on the objective facts contained in the autopsy report did not violate the defendant's right to confront the pathologist who prepared the report. (*Id*. at p. 621.)

Appellant contends *Dungo* was wrongly decided, but the California Supreme Court recently affirmed its holding in *People v. Edwards* (2013) 57 Cal.4th 658 (*Edwards*).)  In *Edwards*, the court reiterated that "[a]utopsy statements that simply record anatomical and physiological observations" are distinct from "statements of the autopsy physician's expert conclusion as to the cause of death.  [Citation.]"  (*Id*. at p. 706.)  Without deciding whether statements in the latter category are testimonial, *Edwards* held it was permissible for an expert witness to recount the autopsy doctor's findings that the victim's nose was fractured, the injury to her ear was "'incisional,'" she had residue from adhesive tape around her mouth, and her vagina had signs of trauma. (*Id*. at pp. 707-708.)  Distinguishing those findings from forensic opinions about the cause of death, the court determined it was permissible for the expert to rely on them because they merely reflected the autopsy doctor's "medical observations of objective fact."  (*Id*. at p. 708.)

Under the authority of *Edwards* and *Dungo*, Dr. Singhania and Dr. Juguilon were properly allowed to rely on Dr. Andrew's report in giving their opinions about the cause of Warren's death.  Unlike the autopsy reports in those cases, Dr. Andrew's report was based on a microscopic examination of the victim, as opposed to a mere visual examination.  However, while the method of his analysis was more detailed than the autopsy doctors' methods in *Edwards* and *Dungo*, his report was similar to theirs in that it merely reflected objective facts about the victim's body.  In particular, his finding of "chronic sequelae" reflected the fact Warren had scarring on his brain, and his finding of DAI reflected the fact Warren had nerve cell damage over a large portion of his brain. Those findings are akin to the findings of exterior cuts, fractures and trauma that were at issue in *Edwards* and *Dungo*.  Therefore, Drs. Singhania and Juguilon were entitled to mention them in giving their opinions about Warren's death.  Because they only

referenced Dr. Andrew's factual findings, as opposed to his opinion on the cause of death, their testimony did not violate appellant's confrontation rights.[3]

## IV

Appellant contends the cumulative effect of the errors that occurred at his trial rendered his trial unfair. But the only error that occurred was the failure to redact the reference to "jack[ing] people" on the interview tape and transcript, which, as we've explained, does not undermine our confidence in the verdict. The absence of *multiple* trial errors renders the cumulative error doctrine inapt. (*People v. Bennett* (2009) 45 Cal.4th 577, 618.)

## V

Lastly, appellant claims the robbery-murder special circumstance statute is unconstitutional because it authorizes death or life without parole under virtually the same circumstances which justify a finding of felony murder. (See *Romano v. Oklahoma* (1994) 512 U.S. 1, 7 [capital sentencing scheme must genuinely narrow class of people eligible for death penalty].) However, as appellant recognizes, our Supreme Court "has consistently rejected the claim that the statutory special circumstances, including the felony-murder special circumstance, do not adequately narrow the class of persons subject to the death penalty." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1195, citations omitted.) Appellant also acknowledges that, as a matter of stare decisis, we are powerless to rule otherwise. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d

---

3       Appellant notes that, in her opening argument, the prosecutor claimed, "The evidence will show that a conclusion was reached by all — Dr. Singhania, *Dr. Andrews*, Dr. Juguilon — that . . . Warren died as a result of the injuries he suffered as a result of the robbery and assault . . . ." (Italics added.) However, as it turned out, the evidence did not reveal Dr. Andrew's opinion on the cause of Warren's death. That does not change our take on the confrontation issue. In its preliminary instructions to the jurors, the trial court told them nothing the attorneys say, including their opening statements, is evidence. We presume the jurors heeded this instruction and convicted appellant based on the evidence adduced at trial, as opposed to the arguments of counsel. (*People v. Morales* (2001) 25 Cal.4th 34, 47.) We do not believe "the prosecutor's isolated mischaracterization of the evidence in her opening argument misled the jury." (*People v. Sanchez* (1995) 12 Cal.4th 1, 70.)

450, 455.)  As he raises the issue solely to preserve it for federal review, we will leave it at that.

DISPOSITION

The judgment is affirmed.


BEDSWORTH, J.


WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.

32